## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CORY NOVICK, | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| v. | ) | Civil Action No. 1:25-cv-04205 |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE; | ) | |
| | ) | |
| PAMELA BONDI, | ) | DATE: December 2, 2025 |
| in her official capacity as | ) | |
| Attorney General of the United States. | ) | |
| | ) | |
| U.S. ATTORNEY'S OFFICE FOR | ) | **JURY TRIAL DEMANDED** |
| THE DISTRICT OF COLUMBIA; | ) | |
| | ) | |
| JEANINE FERRIS PIRRO, | ) | |
| in her official capacity as | ) | |
| U.S. Attorney for the District of Columbia. | ) | |
| | ) | |
| U.S. MARSHALS SERVICE, | ) | |
| | ) | |
| GADYACES S. SERRALTA, | ) | |
| in his official capacity as | ) | |
| Director of the U.S. Marshals Service. | ) | |
| | ) | |
| ROBERT DIXON, | ) | |
| in his official capacity as | ) | |
| U.S. Marshal for the United States Marshals Service | ) | |
| for the Superior Court of the District of Columbia; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

## COMPLAINT

### I.     SUMMARY

This case arises out of an extraordinary set of facts where a Deputy U.S Marshal was summarily terminated from employment merely for being on a "list" of persons who might have issues related to their ability to testify in court.  Plaintiff Cory Novick ("Mr. Novick" or "Plaintiff" unless otherwise specified) is a former Officer in the Washington, D.C., Metropolitan Police Department ("MPD"), who served on a crime suppression team. On the night of October 23, 2020, he was a passenger in a police vehicle that observed a suspected gang member in a high crime area. Police sought to question the suspect, who fled on a moped, driving erratically and dangerously through city streets. Unfortunately, the young man, an African American male, died when he drove into oncoming traffic, while trying to evade police. The death touched off a wave of mob violence against police.

Federal prosecutors brought a highly controversial homicide case against some of the police involved. Mr. Novick truthfully testified regarding his observations before a grand jury, during pre-trial proceedings, and at trial. Oddly, he was repeatedly called to the stand, by both the prosecution and the defense, apparently for the strength of his testimony.

Apparently, that truthful testimony did not comport with the prosecutorial narrative, although Mr. Novick faced neither any criminal charges or a judicial finding that he lacked credibility, arising from any supposedly misleading testimony. Nine months after joining the United States Marshal's Service ("USMS"), he was terminated solely for being placed on what is known as the "*Lewis* list", which apparently identifies witnesses whom the United States Attorney's Office for the District of Columbia ("USAO-DC") feels may have issues with their credibility in testifying.  To date, Mr. Novick has not been told who placed him on the list or why, beyond the statement that his placement on the *Lewis* list is related to his testimony, despite the

fact that this testimony occurred more than a year before Mr. Novick's termination. Furthermore, Mr. Novick has been given no due process of any kind. Mr. Novick has neither been informed of the specific basis for his listing and subsequent termination, nor given any opportunity to submit evidence or argument in response.

Further underlining the miscarriage of justice, the two MPD officers who were actually convicted of homicide and obstruction of justice at trial were fully pardoned by President Trump on January 22, 2025, and have been fully reinstated to the MPD. Mr. Novick, who committed no misconduct of any kind, was summarily fired on the apparent say-so of some undisclosed person, placing him on a list pursuant to secret procedures, for unknown reasons.

The implications of this case extend well beyond Mr. Novick. Under Supreme Court case law, prosecutors are bound to disclose matters to a defendant which may bear on the credibility of law enforcement officers involved in a criminal case. Under the procedure Mr. Novick has faced, law enforcement officers as a whole are subject to secretive decisions that declare them unfit to testify. Since testimony is an essential function of law enforcement, determining that an officer has a testimonial impairment has serious professional consequences and is akin to an adverse employment decision.

This Complaint, alleging race-based discrimination and a lack of fundamental due process, seeks to both rectify an unlawful firing and demand that law enforcement agents be granted basic due process when subject to shadowy decisions as to their credibility made by prosecutors who could be motivated by personal, racial, or political animus.

## II.    PARTIES

1.    **Plaintiff: Cory Novick** is a resident of the state of Maryland who was employed as a Metropolitan Police Officer from April 30, 2018, until December 21, 2021. He also served as

a Deputy U.S. Marshal GL-1811-07 in D.C. Superior Court from June 4, 2023, until he was terminated on March 22, 2024.

2.     **Defendant United States Department of Justice ("DOJ")** is a federal executive agency with headquarters located at 950 Pennsylvania Avenue NW, Washington, DC 20530. The DOJ oversees criminal prosecutions and the handling of certain affirmative and defensive civil claims on behalf of the United States. The DOJ also oversees federal law enforcement entities including the U.S. Marshals Service and coordinates oversight, policy, and procedures for the ninety-three U.S. Attorney's Offices located throughout the United States and its territories.

3.     **Defendant U.S. Attorney's Office for the District of Columbia ("USAO-DC")** is a subordinate component of the DOJ with its principal office located at 601 D Street Washington, DC 20530. The USAO-DC is responsible for representing the United States in federal criminal prosecutions and civil litigation in the District of Columbia.

4.     **Defendant United States Marshals Service ("USMS")** is a federal law enforcement agency within the DOJ with its headquarters located at 1215 S. Clark Street, Arlington, VA 22202. The USMS is responsible for providing security in federal courthouses, protecting federal judges, apprehending federal fugitives, managing, and selling seized assets, housing, and transporting federal prisoners, and operating the Witness Security Program.

5.     **Defendant Pamela Bondi** is the Attorney General of the United States and head of the DOJ. She is named in her official capacity and is not believed to have any personal knowledge of the matters giving rise to the Complaint.

6.     **Defendant Gadyaces S. Serralta** is the Director of the USMS, is sued in his official capacity, and is not believed to have any personal knowledge of the matters giving rise to the Complaint.

4

7.    **Defendant Jeanine Ferris Pirro** is the U.S. Attorney for the District of Columbia, is sued in her official capacity, and is not believed to have any personal knowledge of the matters giving rise to the Complaint.

8.    **Defendant United States of America** is named as a defendant pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 et seq., for the APA claims, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(c), which requires that the head of the department, agency, or unit be named as defendant, and pursuant to 28 U.S.C. § 1331 for claims arising under the First and Fifth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (Federal question), 1343 (Civil Rights), 1346 (Federal Defendant), and 42 U.S.C. § 2000e-5(f)(3), as this action alleges violations of rights guaranteed by the U.S. Constitution, laws of the United States, Title VII of the Civil Rights Act, and because this matter involves federal defendants.

10.    The Court has further jurisdiction under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, to review final agency action by federal defendants, including placement on the *Lewis* list, which is arbitrary, capricious, and in violation of the Constitution and federal law and which is the actual and proximate cause of the loss of a protected property interest, that is Plaintiff's right to federal employment.

11.    The Court has authority to grant declaratory relief under the Declaratory Judgement Act, 28 U.S.C. §§ 2201 *et seq*.

12.    Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391, as the Plaintiff was employed both as a Metropolitan Police Officer and a Deputy U.S. Marshal in the District of Columbia, he was terminated by supervisory personnel in the District of Columbia, and

the offending actors were employed at the U.S. Marshals Service and U.S. Attorney's Office in the District of Columbia. *See* 42 U.S.C. § 2000e-5(f)(3).

### III.    STATEMENT OF FACTS

> **A.    Acting on a tip from a Uniformed Police Officer, Officers operating to suppress Violent Crime, Approach and then give brief chase to Suspected Gang Member Karon Hylton-Brown who crashes his Moped into oncoming traffic and sustains terminable Injuries.**

13.    Between the date of his hire until the date he resigned from the MPD on December 21, 2021, Mr. Novick had no record of misconduct or discipline.

14.    Since joining MPD in April of 2018, Mr. Novick served in MPD's Fourth District, assigned to the service area in which the Kennedy Street Crew ("KDY") operated.

15.    In September 2020, Mr. Novick was selected for to the Crime Suppression Team ("CST") in the Fourth MPD District.

16.    KDY had terrorized portions of the Fourth District, turning the Brightwood Park area of Northwest D.C. into an open-air drug market. KDY enforced its will by violence and was heavily armed. Part of design of the CST was to identify KDY members and target them for arrests and prosecutions.[1]

17.    Mr. Novick's specific duties required him to interdict, disrupt, and suppress criminal activity through community policing, a practice that required familiarity with people suspected of involvement in gang-related or criminal activity.

---

[1] USAO-D.C., Press Release of December 13, 2024 "Kennedy Street Drug Gange Members Sentenced for Drug Trafficking while Armed with Guns" (December 13, 2024) https://www.justice.gov/usao-dc/pr/kennedy-street-drug-gang-members-sentenced-drug-trafficking-while-armed-guns (describing the working of the KDY Crew and efforts to incarcerate its members).

18.    On October 23, 2020, then-Officer Mr. Novick and fellow Officers Terence Sutton, Carlos Tejera, and Ahmed-Al-Shrawi were on patrol in an unmarked police vehicle in the Brightwood Park area of Northwest, Washington DC.

19.    The area was targeted because of the persistent pattern of violent crime. [2]

20.    At around 10:00 pm while on duty, a uniformed patrol officer informed the CST, including Mr. Novick seated in the back seat of the CST vehicle, that Karon Hylton-Brown, a person well-known to police for suspected gang activity, had been seen circling the area. She believed Hylton-Brown may have been looking for someone and was concerned about his intentions after reports of his involvement in an earlier altercation.

21.    The officer's statement was direct and explicit, and provided ample reasonable suspicion if not probable cause to stop and question Hylton-Brown.

22.    At approximately 10:30 p.m. at 4th and Kennedy Streets NW, Washington, D.C. police spotted Hylton-Brown and attempted to speak to him.

23.    The officers had previous contact with Hylton-Brown and both they and Hylton-Brown knew each other.

24.    Hylton-Brown therefore knew the unmarked car contained MPD officers.

25.    Hylton-Brown refused to speak with police and instead mounted a moped and fled the scene.

26.    Hylton-Brown's flight included him driving erratically, starting with departing through a red light and narrowly avoiding being struck by a vehicle. He criss-crossed the street and used the public sidewalk as a roadway, in violation of D.C. law. *See* D.C. Code 50-22014a(4).

---

[2] In 2020, District of Columbia crime statistics identified Brightwood Park and the Kennedy Street as one of the most violent areas of Northwest D.C., with significantly higher rates of drug activity and violent crime including carjackings. That year homicides increased to their highest level in more than a decade.

27.    Police then activated their emergency lights, a clear sign that requires a driver to pull over and stop.

28.    Hylton-Brown ignored the signal and continued to flee. *See* D.C. Code 50-2201.05(b)(1).

29.    Hylton-Brown evaded police by driving recklessly.

30.    Hylton-Brown drove for approximately two to three minutes through city streets and on city sidewalks. He ignored traffic signals in his effort to evade police.

31.    In his reckless effort to evade police, Hylton-Brown drove through an alleyway at the 700 Block of Kennedy Street NW.

32.    Emerging from an alleyway, Hylton-Brown turned into oncoming traffic and was struck by civilians in a passing vehicle.

33.    MPD did not cause the death of Hylton-Brown; his flight from police and reckless driving pattern did.

34.    Hylton-Brown suffered a serious, life-ending head injury as a result of the crash.

35.    Mr. Novick, upon seeing Hylton-Brown's injuries, fully complied with his duties to render aid.

36.    Mr. Novick applied emergency aid until Emergency Medical Technicians arrived.

37.    Hylton-Brown's injuries were too severe. Two days later, on October 25, 2020, Hylton-Brown died from the injuries sustained as a result of his collision.

**B.    In response to Community Violence and Perceptions of Racism, the USAO-DC Prosecutes MPD Officers for Murder**

38.    The death of Hylton-Brown was portrayed in the media as a form of police brutality, the narrative being that Hylton-Brown had been illegally pursued because he was a young Black male.

8

39.    Media reports described Hylton-Brown as a caring, humorous young man, a caring father, and a man pursuing a high school education who was harassed by police and targeted for no reason.

40.    Hylton-Brown, however, had an extensive criminal record and frequent contact with law enforcement.

41.    But the public narrative portrayed Hylton-Brown as a victim of racially motivated police brutality.

42.    Not inconsequentially, on October 28, 2020, violent protests broke out when a mob attacked the Fourth District Police Station. Police had to resort to teargas to disperse the attackers.

43.    A few months earlier, George Floyd, a Black man from Minneapolis, had died when a white police officer knelt on his neck and suffocated Mr. Floyd to death. The underlying suspected crime was passing what appeared to be counterfeit small denomination legal tender.

44.    Mr. Floyd's death was seen as racially-motivated and an illustration of police insensitivity and brutality towards marginalized communities.

45.    Nationwide protests erupted along with demands for police reform and accountability, especially in the area of police interaction with the communities of color.

46.    Many of these protests were peaceful and non-violent, something the attacks on the Fourth District station were not.

47.    Within this inflamed public milieu, the U.S. Attorney's Office launched an investigation into Hylton-Brown's death. Hylton-Brown was Black and the MPD officers were not.

48.    The facts surrounding Hylton-Brown's death could scarcely have been more discordant with those surrounding Floyd's.

49.    Hylton-Brown possessed a prior criminal record and had known gang ties.

50.    Hylton-Brown contributed to his own death through his own extreme negligence, driving recklessly into oncoming traffic, fleeing police, and ignoring lawful commands to stop.

51.    Police had evidence at the time of the pursuit of information that suggested Hylton-Brown was in the process of committing or would imminently commit violent criminal activity.

52.    No police officer inflicted any force on Hylton-Brown.

53.    Police documented Hylton-Brown's collision and rendered emergency first aid.

54.    Police promptly called for medical assistance to transport Hylton-Brown by ambulance.

55.    Despite this, in a highly controversial, and many believe politically and racially motivated, response, the USAO-DC chose to commence a criminal investigation into the circumstances surrounding the death of Hylton-Brown and equated the actions of police to criminality and expressions of racism.

56.    The USAO-DC focused on both the pursuit of Hylton-Brown and the police reporting of the incident.

57.    The USAO-DC contended that Officer Sutton, the MPD officer driving the CST vehicle who sought to pull over Hylton-Brown, had used excessive speed.

58.    The USAO-DC contended that Hylton-Brown and that Officer Sutton had acted recklessly in pursuing Hylton-Brown through an alleyway.

59.    Police maintained that they did not exceed the speed limit and, given the fact they were driving on tight streets and through alleyways, they could not have used excessive speed.

60.    Police maintained that Hylton-Brown caused his own death and that they were not civilly or criminally responsible for it.

61.     The USAO-DC, however, asserted that Officer Sutton sped up to catch or confront Hylton-Brown in such a manner that caused Hylton-Brown to flee into oncoming traffic.

62.     Prosecutors developed a narrative that Officer Sutton's pursuit, not Hylton-Brown's recklessness, was the proximate cause of Hylton-Brown's death and that it was the police, not Hylton-Brown who drove in a reckless, dangerous fashion.

63.     The USAO-DC contended that Sutton's pursuit contravened MPD policy.

64.     USAO-DC charged Officer Sutton with second-degree murder.

65.     The USAO-DC then claimed that police had sought to hide their conduct by manipulating the reporting of the pursuit, crash, and injuries of Hylton-Brown.

66.     Prosecutors contended that Officer Sutton and Lt. Zabavsky, the head of the unit that evening, had, through their manipulated reporting of the incident, combined and conspired to obstruct justice and did in fact obstruct justice by minimizing their own conduct and the response to Hylton-Brown's injuries.

67.     Mr. Novick, however, rendered first aid at the scene and attended to Hylton-Brown.

68.     Mr. Novick engaged in no conduct that contributed to Hylton-Brown's death.

69.     Plaintiff did not author, alter, amend, or falsify any document to minimize Hylton-Brown's injuries.

### C.     Plaintiff is Given an Immunity Grant and Truthfully testifies to the Grand Jury

70.     When the USAO-DC ultimately presented the matter to the Grand Jury, the lead prosecutor was Risa Berkower, who worked in the Public Corruption and Civil Rights Section of the U.S. Attorney's Office.

71.     Other than his own testimony, the contents of the testimony before the Grand Jury are not known to Mr. Novick.

11

72.     Given the criminal proceeding, in December 2020, Mr. Novick and Officer Sutton were provided counsel through the Fraternal Order of Police Legal Defense Fund.

73.     On July 23, 2021, Mr. Novick appeared before a federal grand jury. He testified truthfully and accurately as to his recollection of the events surrounding Hylton-Brown's actions and subsequent collision with a motor vehicle.

74.     At the grand jury, Mr. Novick was represented by the same Fraternal Order of Police Defense counsel that represented Officer Sutton.

75.     Prior to testifying before the Grand Jury, Mr. Novick properly asserted his Fifth Amendment rights under the U.S. Constitution.

76.     Federal prosecutors then moved for and obtained an immunity grant to Mr. Novick that would obviate any Fifth Amendment concern and require him to testify before the grand jury.

77.     The immunity grant only applied to truthful testimony from Mr. Novick; it did not immunize him from prosecution for giving false testimony or making false statements, both of which are criminal acts subject to prosecution.

78.     The grand jury investigation centered on three issues: first, whether police had acted in reckless disregard of protocol; second, whether their actions had, in fact, caused the death of Hylton-Brown without justification; and third, whether the officers had been forthcoming in reporting on their interaction with Hylton-Brown.

79.     On July 23, 2021, Mr. Novick testified before the grand jury. Ms. Berkower examined him.

80.     Upon information and belief, Berkower had assisted in the prosecution of the defendants involved in the events of January 6, 2021.

81.     Berkower treated Mr. Novick as a hostile witness.

82.     Berkower treated Mr. Novick harshly, dismissively, and unprofessionally, with Berkower actually denigrating him to the grand jury.

83.     On September 23, 2021, the grand jury returned an indictment that charged as follows: Terence Sutton with Murder in the Second Degree, in violation of D.C. Code §22-2103, because he allegedly caused Hylton-Brown's death by driving a police vehicle in conscious disregard for an extreme risk of death or serious bodily injury to Hylton-Brown.

84.     The indictment also alleged that Officer Sutton and Lt. Zabavsky, Officer Sutton's supervisor, conspired to obstruct justice, in violation of 18 U.S.C. § 371, obstructed justice, and aided and abetted each other in doing so, in violation of 18 U.S.C. § 1512, by concealing the circumstances of the traffic collision leading to Hylton-Brown's death.

85.     Conspicuously, the indictment merely stated that police were pursuing Hylton-Brown, who "was not wearing a helmet," but did not disclose why police approached Hylton-Brown, why Hylton-Brown fled, or any of the context that would have supported the rationale for the attempted stop.

86.     Additionally, the indictment acknowledged that the entire pursuit lasted approximately 180 seconds (three minutes).

87.     Mr. Novick was not mentioned in the indictment.

88.     Mr. Novick's testimony was truthful.

89.     The prosecution confirmed this when it subpoenaed Mr. Novick to testify at the trial of the indicted officers.

90.     To Mr. Novick's knowledge, the prosecution did not cite Mr. Novick for being credibility-impaired in pre-trial litigation and did not otherwise reveal any concerns related to his

credibility or candor following his grand jury testimony. Instead, the prosecution pressed forward with having him testify as a government-sponsored witness.

### D. Mr. Novick gives Truthful Trial Testimony while Repeatedly Examined as a Witness for Both the Prosecution and Defense

91. With Mr. Novick as a government witness, the attorney who had represented both him and Sutton pre-trial now had a conflict.

92. Accordingly, the Court appointed conflict counsel for Mr. Novick early in the trial process.

93. Oddly, the Court did not see the conflict as unwaivable, although it created the prospect that Mr. Novick would be examined and cross-examined by his own former counsel.

94. The court-appointed conflict counsel did not seek to disqualify any counsel or assert any patent conflict. Apparently, conflict counsel also did not appear at trial.

95. Starting in November 2022, Mr. Novick served as a witness for both the prosecution and the defense in a grueling and antagonistic nine-week trial commenced against Officer Sutton and Lt. Zabavsky.

96. At trial, Mr. Novick testified under another immunity grant which prohibited his prosecution for truthful testimony, but provided no immunity in the event of false testimony or false statements.

97. Not only did both the government and the defense call Mr. Novick to testify at trial, but he was also required to respond to multiple rounds and multiple days of questioning by three separate attorneys, including Mr. Novick's former attorney.[3]

---

[3] Mr. Novick's former counsel was authorized to question Mr. Novick by the court.

98.    Given the nature of Mr. Novick's role, neither side prepared him for testifying and his conflict counsel appears to have limited his advice to the issue of whether Mr. Novick could or would testify.

99.    The trial was hotly contested and the subject of intense media review.

100.    At no time during the trial did Mr. Novick testify untruthfully.

101.    At no time during the trial was Mr. Novick impeached.

102.    Indeed, at no time during trial did the court issue a specific instruction or ruling finding that Mr. Novick was not credible, or that his testimony should be disregarded, nor did it hold that he was dissembling or needed to be instructed to answer questions.

103.    While the prosecution requested a jury instruction identifying Mr. Novick, among others, as an impeached witness, Defense counsel objected and advised the court that the prosecution had never impeached Mr. Novick.

104.    The Court refused the prosecution's request.

105.    Instead, the Court gave general instructions on the credibility of witnesses, as it does in any trial involving eyewitness testimony.

106.    The USAO-DC never moved to revoke Mr. Novick's grant of immunity, nor did they accuse him of giving false testimony or making false statements.

107.    To date, Mr. Novick has never been provided written or verbal notice of how his testimony at either grand jury or trial was false, misleading, dissembling, inconsistent, or raised any issue of his credibility or his ability to testify under oath.

108.    Mr. Novick testified on the following occasions: before the grand jury on July 23, 2021, at a pretrial evidentiary hearing on October 17, 2022, and over six separate days during the course of trial from mid-November to the beginning of December of 2022.

109.    The trial concluded more than two years after Hylton-Brown's death, with the jury returning a guilty verdict against both Officer Sutton and Lt. Zabavsky on all counts.

        **E.**    **Mr. Novick completes a Background Check and is Hired by the US Marshal's Service**

110.    Convinced that continued employment at MPD would be all but impossible following the Hylton-Brown incident, Mr. Novick left MPD and served as a Deputy Sheriff in Calvert County, Maryland.

111.    Mr. Novick subsequently applied to the United States Marshals Service for employment as a Deputy U.S. Marshal.

112.    The USMS position he applied for required the completion of an Office of Personnel Management Standard Form 86 ("SF-86") Questionnaire for a National Security Position, which he submitted in February of 2022.

113.    Mr. Novick was candid and fully disclosed his actions and testimony in the Hylton-Brown prosecution both on his SF-86 and in an extensive interview with federal background investigators. He informed the USMS of the basic circumstances of the case, and that he had already testified at the grand jury. Once he learned he would be testifying at trial, Mr. Novick informed the USMS of this fact, as well.

114.    Mr. Novick was interviewed by an investigator in March 2022, during which he provided complete, candid answers to the investigator's questions.

115.    Mr. Novick was cleared for employment and commenced working for the USMS on June 4, 2023, following his graduation from the Basic Deputy U.S. Marshal Academy with a graduation rating of "excellent" and the class award for firearms proficiency.

116.    From June 4, 2023, until his termination nine months later, then-Deputy U.S. Marshal Novick provided security and assistance to judges and court personnel in the United States

16

District Court for the District of Maryland in Greenbelt and in Superior Court of the District of Columbia, as well as residential security for a United States Supreme Court Justice.

117.    Mr. Novick had no disciplinary issues and was well liked by his supervisors and the judicial officers whom he served.

> **F.    USAO-DC retaliates by notifying the USMS that Mr. Novick is "on the *Lewis* list" due to unspecified testimony during the Hylton-Brown trial**

118.    On March 22, 2024, roughly nine months into his service, the USMS notified Mr. Novick that they had terminated his employment, effective that same day.

119.    The sole reason for this termination was contained in a letter attached to this complaint. *See* Termination Letter, attached hereto as Exhibit A.

120.    Per his Termination Letter, the sole reason for Mr. Novick's summary termination was the USAO-DC placing him on the *Lewis* list.

121.    Prior to termination, Mr. Novick performed well in his position and drew the admiration of his colleagues, superiors, and the judges with whom he worked. On March 22, 2024, however, Mr. Novick was summarily terminated from the USMS.

122.    Although a federal probationary employee is not necessarily entitled to an explanation for their termination, the USMS did inform Mr. Novick that he was removed because the USAO for the District of Columbia had placed him on a "*Lewis* list." That list is designed to identify law enforcement personnel whose conduct has raised issues as to credibility to testify.

123.    On information and belief, the *Lewis* list is the USAO-DC's implementation of the legal disclosure obligations imposed on prosecutors under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). Those cases require prosecutors to disclose negative information bearing on credibility regarding a potential law enforcement officer witness

to the defense in a criminal case. Such information can then be used to impeach or challenge the veracity of testimony the law enforcement witness against whom the disclosure is made.

124.    On information and belief, the *Lewis* list is kept by the U.S. Attorney's Office for the District of Columbia and purportedly identifies law enforcement agents whose credibility could be impaired because of misconduct or a prior investigative finding of bias, including racial bias that might reflect on their veracity. *Lewis v. U.S.*, 408 A.2d 303 (Ct. App. D.C. 1979).

125.    On information and belief, the USAO-DC has a "*Lewis* Committee" comprised of Assistant United States Attorneys who evaluate whether a law enforcement officer should be placed on the *Lewis* list.

126.    On information and belief, the *Lewis* Committee members review matters involving the past conduct of law enforcement personnel that may reflect on their testimonial integrity or which, in the Committee's estimation, require disclosure to the defendant for potential impeachment purposes.

127.     The *Lewis* list in and of itself does not provide grounds for termination, since the list merely provides names of law enforcement agents whose prior conduct creates potential for their impeachment. Being on the *Lewis* list does not preclude one from testifying, it merely memorializes the USAO-DC's determination that a prosecutor must notify a defendant of matters that may be used to challenge credibility.

128.    In this case, however, the placement of Mr. Novick on the *Lewis* list is not only directly responsible for his termination from the USMS, but it has also precluded him from other law enforcement and federal employment opportunities.

129.    On information and belief, similarly situated law enforcement agents, including those in Department of Justice components and federal agencies to whom the *Lewis* list pertains,

have not been placed on the *Lewis* list in circumstances similar to Mr. Novick or with facts similar to Mr. Novick's case.

130.    On information and belief, non-white officers placed on the *Lewis* list were treated more favorably than Mr. Novick in terms of notice of being considered or placed on the list or procedures they could use to challenge that placement.

131.    On information and belief, non-white officers placed on the *Lewis* list were treated more favorably than Mr. Novick and were not disciplined in, or terminated from, employment due to placement on the *Lewis* list.

132.    Although the term *Lewis* list is singular to the USAO in DC, federal (and state) prosecutors nationwide, maintain similar lists pursuant to the cases of *Brady v. Maryland,* 373 U.S. 83 (1963) and *Giglio v. United States,* 405 U.S. 150 (1972).

133.    The USMS *equated the mere placement* of Mr. Novick on the *Lewis* list as actionable and terminable misconduct. Indeed, the USMS made no effort to evaluate, or even inquire into, the purported factual basis for Mr. Novick's placement on the *Lewis* list.

134.    The USMS arbitrarily and capriciously concluded that placement on the *Lewis* list alone, without even knowing the basis for that decision, allowed or required them to terminate Mr. Novick.

135.    *Brady*, *Giglio* and *Lewis*, taken separately or together, merely require disclosure of potentially adverse information known to the prosecution that might lead to impeachment of that witness or to information that would tend to reduce the culpability of the defendant.

> **G.    Mr. Novick is Denied Any Due Process of Law: He is fired because he is on a List but is told nothing more.**

136.    In simplest terms, the *Lewis* list is a mechanism to gather information about law enforcement personnel that may need to be disclosed to the defense in a criminal case.

137.    Placement on the *Lewis* list, standing alone, is generally not ground for an adverse action; if it were, every law enforcement officer placed on the list would need to be disciplined or terminated, and the placement alone on the list would be self-executing.

138.    Upon information and belief, placement on the list alone does not identify the offending conduct that triggers a disclosure requirement. It is the duty of the USAO-DC to disclose the actual grounds for the placement on the list to a criminal defendant.

139.    It is logical and axiomatic that the officer subject to placement on the list be told why they have been placed on the list.

140.    An employee of the federal government, even a probationary employee, who is accused of misconduct, is entitled to some form of due process.

141.    While the government may generally terminate probationary employees for failure to complete the probationary period, that termination is not necessarily adverse.

142.    For this reason, federal agencies are given wide discretion to terminate probationary employees without explanation, which is at-will.

143.    But like the private sector, the government may not advance a false reason for termination, and it must give some form of due process.

144.    The discretionary right of the federal government to discharge probationary employees does not extend to terminations that violate civil rights, nor does it allow illegal terminations based on assertion of protected Constitutional rights.

145.    Here the federal government conflated a secretive finding that Plaintiff did something to merit him being placed on the *Lewis* list, with a finding that Mr. Novick somehow lacked candor or somehow could not perform one of the essential functions of a Deputy U.S. Marshal.

146.    To preserve any legitimacy to Mr. Novick's termination, there must be more than an unsupported assertion by a prosecutor that his conduct prohibits his employment.

147.    The U.S. Marshal's Service must find, where they accuse an employee of disqualifying conduct, a factual basis for that conduct and they must provide the employee notice of the misconduct and some mechanism for challenging that determination.

148.    Here, no such finding was made and Mr. Novick has been given no notice of what the offending conduct was, who alleged it, why it was alleged and what facts or evidence supported the assertion, either by the USMS, the USAO-DC, or any other component of the Department of Justice.

149.    Both the Metropolitan Police Department and the U.S. Marshals Service can discipline and even remove an officer for lack of candor, or some form of misrepresentation made to supervisors, prosecutors, or the court. But such discipline focuses on the actual offending statement or action. Further, the law enforcement employee is subject to some form of factual and evidentiary inquiry.

150.    Due process requires that such an inquiry action lays out the offending conduct, the partial, false, or misleading statement or other conduct that impairs credibility and veracity. In this way the employee is made aware of the actual misconduct and given the opportunity to counter, explain or mitigate the conduct in question.

151.    Employees subject to discipline are given written notice, an opportunity to be heard, the right to representation, the right to see the evidence against them and a written decision, subject to appeal, which sets forth the basis of their removal.

152.    Although federal probationary employees may be removed without cause, that removal is neutral in nature. A probationary employee is simply released, and no derogatory information accrues from that removal.

153.    Being removed for a false or misleading statement or a lack of credibility generally is inherently a removal for misconduct and can have lifelong consequences for an employee subject to such a removal.

154.    When that removal also involves an act of discrimination or reprisal based on being a member of a protected class or in retaliation for supporting the civil rights laws, even probationary employees are granted rights to pursue appeals for adverse actions, since Equal Employment Opportunity laws extend to all applicants and employees of the federal service.

155.    When a police officer truthfully testifies in a court of law, they are exercising not only their core duty but engaging in a form of protected speech, the ability to testify truthfully in a court of law on matters of public importance.

156.    Disciplining a police officer for truthfully testifying under oath is inherently repugnant to ordered liberty and corrosive of the entire justice system.

157.    Without some form of procedural and substantive due process, disciplining or removing an employee based on a supposition or the whim of a prosecutor avoids the typical protections surrounding disciplinary investigations and findings, and instead creates a system where law enforcement agents can be disciplined or even fired based on whether a prosecutor feels they supported the favored narrative.

158.    Such unconstrained discretion would allow a prosecutor to impair or end a law enforcement agent's career due to personal animus, out of racial or other discriminatory animus or in retaliation for that officer not conforming his testimony to the wishes of the prosecutor.

159.    An unfettered process that allows an officer to be designated by a prosecutor as impaired in a testimonial capacity without any procedural safeguards converts a process designed to support the truth by disclosing to a criminal defendant information that could be used for impeachment to protect the criminal defendants rights, into an abusive, weapon of arbitrary, capricious, or retaliatory decision making, a cudgel to shape testimony and intimidate law enforcement witnesses into conforming to a prosecutor's narrative or punish them for failing to do so.

160.    Mr. Novick was never judged by any court or employer to have rendered false, misleading, or dissembling testimony. No court of law concluded that he had been impeached or that his testimony warranted any cautionary instruction. Otherwise, there could be little plausible objection to placement on the *Lewis* list.

161.    Here, Mr. Novick has never been advised of what, if any specific conduct or testimony was responsible for his being placed on the *Lewis* list.

162.    *To this day, Mr. Novick remains uncertain of what specific statement or conduct warranted his placement on the Lewis list in the first instance.*

163.    While he was informed that his placement was due to variances in testimony at trial, he was never informed what specific statements were in variance.

164.    The US Marshals Service has admitted that its sole rationale for terminating Mr. Novick's employment was the notification by the U.S. Attorney's Office that Mr. Novick had been placed on the *Lewis* list.

165.    On information and belief, no other Deputy US Marshal has been terminated for placement on the *Lewis* list alone.

166.    On information and belief, Deputy U.S. Marshals who have had been placed on the list have been retained.

167.    On information and belief, the only comparators used by Marshal's Service were cases where the employee had been found to have lacked candor or affirmatively lied.

168.    Mr. Novick surmised that his placement on the *Lewis* list was actually retaliatory and racially motivated.

169.    USAO-DC prosecutors reacting to national events on police actions involving African Americans, conducted a racially charged prosecution of Metropolitan Police Officers.

170.    The prosecution team treated Mr. Novick in a demeaning fashion and secretly accused him of misconduct based on racial or retaliatory motivations.

171.    On information and belief, prosecutors at the USAO-DC were driven by the discriminatory and retaliatory animus against Mr. Novick and obtained his placement on the *Lewis* list.

172.    The racially discriminatory and retaliatory animus that permeated the USAO-DC prosecution infected the decision to terminate Mr. Novick.

173.    In addition, the termination was based on a falsity, that Mr. Novick had engaged in conduct that left his credibility  impaired.

174.    The determination that Mr. Novick was impaired and had committed misconduct, provided him no due process of any kind and in fact, occurred in a "star-chamber" like proceeding.

175.    Mr. Novick has never been notified <u>who</u> was involved in the determination that he was not credible or lacked veracity.

176.    Mr. Novick has never been notified <u>what</u> facts or evidence supported the determination.

177.    Mr. Novick has never been informed <u>when</u> determination was actually made that he was impaired.

178.    Mr. Novick has never been notified <u>how</u> to challenge or appeal the determination that he impaired.

179.    The procedures used to end his employment were arbitrary and capricious.

180.    Mr. Novick was denied any and all due process to protect his property rights in federal employment.

181.    On information and belief, the USAO-DC has developed no procedural or substantive mechanism for as law enforcement officer to participate in or challenge a determination as to their credibility or veracity or their placement on the *Lewis* list.

182.    As applied to Mr. Novick, he was denied due process of law in the loss of his employment or in the process of determining that he committed misconduct.

183.    On information and belief, the USAO in the District of Columbia has engaged in a pattern and practice of denying federal and local law enforcement agents any procedural or substantive rights as it relates to an adjudication that they have committed some form of misconduct or that facts exist to support that they do or may lack veracity and credibility to testify under oath.

### H.    Mr. Novick files an Administrative Complaint Alleging Racial Discrimination and Reprisal

184.    On May 24, 2024, Mr. Novick filed a formal complaint of discrimination under the Federal Sector EEO processing procedures set forth at 29 CFR §1614, 101 *et. seq*.

185.    Mr. Novick's administrative complaint contended that he had been improperly terminated based on race and cited a "catspaw" theory of liability. He alleged that the placement on the *Lewis* list was an act of retaliation for his truthful testimony regarding the death of Hylton-

Brown. He also asserted that his placement on the *Lewis* list lacked due process, disparate treatment based on race, and that his placement on the *Lewis* list was pre-textual—it was designed to remove him from law enforcement because he was and is white.

186.    As Title VII protects applicants to employment and probationary employees, as well as tenured civil servants, Mr. Novick was and is not precluded from pursuing remedies based on race-based discrimination and retaliation and reprisal.

187.    More than 180 days have now passed since the filing of the formal administrative complaint, thus Mr. Novick has administratively exhausted his complaint and may proceed in the United States District Court. 29 C.F.R. § 1614.407(b).

**IV.    <u>VIOLATIONS OF LAW</u>**

**COUNT ONE**
**Violation of the First Amendment - Retaliation**
**(Retaliation)**

188.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

189.    Mr. Novick engaged in constitutionally protected speech when he testified as a citizen under oath on multiple occasions before the United States District Court for the District of Columbia.

190.    Mr. Novick's testimony was a matter of public concern, as it involved participating in a judicial proceeding in *United States v. Terence Sutton et al.*, 21-CR-598 (PFL), a high-profile case against MPD officers. It is therefore entitled to the highest level of protection under the First Amendment.

191.    Mr. Novick suffered adverse actions that would likely deter a person of ordinary firmness from engaging in such speech. Specifically, Defendants placed Mr. Novick's name on the *Lewis* list, ultimately leading to the termination of his employment at USMS.

192.    There is substantial causal connection between Mr. Novick's protected speech and Defendants' adverse actions.

193.    The factual and temporal nexus between Mr. Novick's protected speech and his placement on the *Lewis* list and ultimate termination is clear, if not unequivocal. While the USAO-DC has refused to identify why Mr. Novick was placed on the list, it is certain that his participation in the Hylton-Brown case and the testimony he gave was and is at the heart of the animus toward him. Thus, Mr. Novick's exercise of his First Amendment right was a substantial or motivating factor for Defendants' actions, including placing Mr. Novick's name on the *Lewis* list, and terminating his employment.

194.    Defendants and their officers' retaliatory actions caused actual injury to Mr. Novick, including loss of his reputation and property-based interest in employment at USMS.

195.    Defendants and their officers' retaliatory actions will continue to cause irreparable harm by chilling Mr. Novick's exercise of his free speech rights.

196.    Defendants and their officers acted in clear violation of well-settled law regarding the standards for retaliation in violation of the First Amendment of the United States Constitution.

197.    Mr. Novick is entitled to damages against Defendants as he has suffered loss of income, lost career opportunities, and emotional distress.

198.    Defendants' adverse actions were designed to chill, suppress, and control speech, and would likely deter a person of ordinary firmness from engaging in protected First Amendment activity.

199.    Mr. Novick is entitled to injunctive and declaratory relief against Defendants finding their actions in violation of the First Amendment and compelling all Defendants to cease retaliating against Mr. Novick for his First Amendment protected speech. Mr. Novick is also entitled to attorney's fees and costs and any other relief this court may deem just and proper.

## COUNT TWO
## Violation of the Fifth Amendment – Procedural Due Process
### (Stigma-Plus Liberty Interest)

200.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

201.    Defendants and their officers placed Mr. Novick on the *Lewis* list without providing him with any notice or an opportunity to rebut or challenge his placement on the *Lewis* list.

202.    Defendants and their officers' placement of Mr. Novick on the *Lewis* list stigmatized Mr. Novick's reputation by falsely branding him dishonest and untrustworthy, thereby impugning his integrity in the law enforcement and criminal justice community. According to Defendants and their officers, placement of Mr. Novick's name on the *Lewis* list automatically led to termination of his employment.

203.    Placement of Mr. Novick's name on the *Lewis* list has also led to loss of professional opportunities and permanent disqualification from any police or law-enforcement services in and around the District of Columbia, to include his former employment as a Deputy Sheriff in Calvert County, Maryland, and throughout the remainder of his actual and potential career in positions that require high level clearances or the ability to testify under oath.

204.    Punishing law enforcement officers for giving truthful testimony not only impacts the officer but the public at large. Law enforcement officers may be intimidated by the power of a

prosecutor to use a *Lewis* list or a *Giglio/Brady*-type determination to claim that the officer has engaged in conduct that impairs or impedes their ability to testify.

205.    The ability to testify truthfully under oath is an essential and critical aspect of any law enforcement position.

206.    Here, individuals within the USAO-DC placed Mr. Novick on the *Lewis* list, which ordinarily only occurs when an officer engages in misconduct or other actions that involve dishonesty, then notified the USMS of a purportedly serious impairment of a core function of his employment.

207.    Here, not only did the USAO-DC place Mr. Novick on the *Lewis* list with any prior notice or opportunity to submit evidence or otherwise be heard, the USAO-DC also notified the USMS of Mr. Novick's placement without notice to Mr. Novick.

208.    Even in its communications with the USMS, the USAO-DC failed to state the basis for its decision to place Mr. Novick on the *Lewis* list, who was involved in making that decision, what evidence they relied upon, how they evaluated that evidence, and why it raised a substantial fitness issue.

209.    The secretive nature of this Star Chamber-like process is a weapon against law enforcement personnel, subjecting them to the whims of vindictive prosecutors.

210.    Secretive Star Chamber decision-making is an affront to ordered liberty.

211.    Only the government can determine whether law enforcement agents are somehow impaired in their credibility or that their conduct requires disclosure of facts related to their conduct or integrity that could be grounds for impeachment when testifying.

212.    To allow a branch of the Executive the unfettered right to determine whether a law enforcement agent has testified in an improper fashion, without some level of due process for that

officer to defend themselves and to participate in or contest such a finding, would create a club from that branch that could be used to shape the underlying testimony itself.

213.    Without the protections of due process, such procedures could serve, like here, as a weapon for disgruntled prosecutors whose case failed to produce the desired result, to blame the law enforcement personnel for such a disappointing result, or to punish law enforcement officers whose factual recollections differ from what the prosecutor sought.

214.    The necessity of due process is therefore not only critical to the rights of the law enforcement officer under scrutiny, but to the public at large. The right to notice of allegations of impeachable conduct and an opportunity to address those allegations forms the core of constitutional protections under the Fifth Amendment.

215.    Law enforcement agents hold a special position, to protect public safety at risk to themselves. When addressing crime or recalling matters related to the administration of justice, they must be able to provide truthful, accurate testimony, regardless of outside pressures.

216.    But just as law enforcement officers should not dissemble to protect misconduct in law enforcement itself, they should not conform their testimony because of the wrath of the public, the secondhand judgment of prosecutors responding to public pressure, or a preferred narrative designed to support a particular outcome. Yet this is precisely what the current secretive, subjective, and arbitrary system allows.

217.    Without notice, an opportunity to be heard, the right to be represented, and the right to be provided in writing the rationale of any employment-ending decision, a law enforcement officer is being denied due process.

218.    This same lack of due process permeated the Defendants' treatment of Mr. Novick. Neither MPD nor the USMS held any formal disciplinary process that granted Mr. Novick notice

of the allegations against him or any opportunity to be heard. No supervisor alleged that Mr. Novick had committed misconduct or performed poorly. Again, Mr. Novick had no opportunity to present mitigating or contradictory facts or evidence and received no notice of what he alleged did or said that was wrong. No official provided him with the substance of that purported wrongdoing.

219.    No judge adjudicated Mr. Novick to have provided dissembling or false testimony. There was no perjury finding, nor even a judicial instruction or admonition that Mr. Novick had been substantially inconsistent or unbelievable in his testimony.

220.    Only the government can obtain immunity from prosecution for a witness. This power is necessary to secure testimony where a potential witness might otherwise be exposed to some form of self-incrimination. It is used often to compel witnesses—who could refuse to testify for a myriad of reasons including loyalty to fellow police officers—into providing truthful and accurate testimony.

221.    Where a witness has not provided truthful and accurate testimony, the government has the remedy of withdrawing that immunity. It must do so for specific reasons in writing, which it has the burden to establish.

222.    Here the government did not move to withdraw Mr. Novick's immunity grant, nor did it notify Mr. Novick that he had testified falsely, deceptively, or even inconsistently or accuse Mr. Novick of any crimes based on supplying false testimony, such as perjury or giving false statements. It cited no specific testimony or act that could establish that Mr. Novick had raised the specter of impeachable misconduct. Instead, it surreptitiously and disingenuously had him fired by the USMS on a naked and unspecific allegation related, somehow, to his testimony in the Hylton-Brown proceedings. The USMS interpreted that as dischargeable misconduct.

223.    Under these circumstances, the denial of due process rises to constitutional import, and its results were career ending, not only for Mr. Novick at the time he was terminated, but permanently.

224.    Defendants and their officers' inexplicable refusal to provide Mr. Novick with any reason or basis for its determination that his prior testimony made it necessary for him to be placed on the *Lewis* list, and refusal to provide Mr. Novick with a meaningful opportunity to challenge the inclusion of his name on the *Lewis* list, followed by their decision to terminate Mr. Novick's employment, deprived Mr. Novick of constitutionally protected liberty interests, including but not limited to the right to be free from false governmental stigmatization.

225.    Mr. Novick is entitled to declaratory and injunctive relief, attorney's fees, and costs, and for such other relief as the Court deems appropriate.

## COUNT THREE
## Violation of the Fifth Amendment
## (*Accardi Doctrine*)

226.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

227.    The Due Process Clause of the Fifth Amendment mandates that no person shall "be deprived of life, liberty, or property, without due process of law [,]" which includes the protection of procedural safeguards. U.S. Const. Amend. V.

228.    The *Accardi Doctrine* requires federal agencies to follow their own rules and internal policies as a matter of constitutional due process.

229.    Mr. Novick has a constitutionally protected interest in his professional reputation and continued ability to function effectively as a law enforcement officer, including the ability to testify in court proceedings without being undermined by *Lewis* list designations.

230.    Defendants either have established guidance and protocols governing *Lewis* list determinations, which they did not follow or have no guidance or protocols, rendering decisions arbitrary and capricious.

231.    The failure to have adequate guidance and protocols or the failure to follow such guidance and protocols means that the Defendants failed to protect the rights and interests of law enforcement officers by ensuring accuracy, fairness, and due process in *Lewis* list determinations.

232.    These protocols also ensure that law enforcement officers can have faith that determinations that impact their employment interests are subject to fair, impartial and fact-based decisions and not to the whim of the persons rendering the decisions.

233.    As applied to Mr. Novick and as stated, *supra*, he has yet to be told who decided he should be placed on the *Lewis* list and why. Such a process invited a "star-chamber" like decision making, free of review by any entity.

234.    Refusal to provide such protections renders decisions secretive, arbitrary, capricious, and undermines the faith that all persons, including law enforcement officers, would have in the integrity of application of *Giglio/Brady* doctrines.

235.    Defendants and their officers violated Mr. Novick's Fifth Amendment due process rights by failing to follow their own guidance and protocols when they: failed to provide Mr. Novick with notice before placement on the *Lewis* list; failed to provide Mr. Novick with the specific allegations or information forming the basis for the *Lewis* list determination; failed to afford Mr. Novick any opportunity to respond to the allegations before placement on the *Lewis* list; and failed to provide any mechanism for Mr. Novick to challenge the determination.

236.    The *Accardi Doctrine* has special force when the rights affected are constitutional in nature, as is the case here where Mr. Novick's liberty interest in professional reputation and

career prospects is at stake. As a direct result of Defendants' violation of Mr. Novick's Fifth Amendment due process rights through their failure to follow their own guidance and protocols, Mr. Novick suffered and continues to suffer substantial harm, including: damage to professional reputation; impairment of ability to testify in court proceedings; limitation of career advancement opportunities; and adverse impact on continued employment.

237.    Mr. Novick is entitled to declaratory and injunctive relief against Defendants to remedy Defendants' ongoing violations of the Fifth Amendment and an award of attorney's fees and expenses.

### COUNT FOUR
### Race Discrimination Under Title VII of the
### Civil Rights Act of 1964
### (Disparate Treatment)

238.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

239.    Title VII of the Civil Rights Act of 1964, ("Title VII") makes it "an unlawful employment practice for an employer … to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…." 42 U.S.C. § 2000e-2(a)(1).

240.    Title VII also makes it "an unlawful employment practice for an employer … to limit segregate or classify his employees or applicants for employment in any way which would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race…." *Id*. § 2000e-2(a)(2).

241.    Specifically, no employer shall discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. Mr. Novick is and identifies racially as white/Caucasian.

242.    Defendants within the Marshals Service were aware of Mr. Novick's race from the first time they met him. Likewise, the Department of Justice employees that prosecuted the *Sutton* case were aware of Mr. Novick's race from the first time they met him and may have made others at the Department of Justice and/or United States Attorney's Office aware of his race.

243.    At all times relevant hereto, Mr. Novick performed his job satisfactorily while employed at the USMS and was never found by any court to lack credibility.

244.    Mr. Novick suffered a two-part adverse employment action—(1) Defendants, including members of the *Lewis* committee, added his name to the *Lewis* list and (2) due to his placement on the *Lewis* list, Defendant USMS, and those acting in concert with them, terminated Mr. Novick's employment.

245.    By letter dated March 22, 2024, and signed by U.S. Marshal Robert Dixon, Defendant terminated Mr. Novick's employment purportedly because Mr. Novick's name was added to the *Lewis* list based on his sworn testimony in *United States v. Terence Sutton et al.*, 21-CR-598 (PLF), where he testified for the government and the defense.

246.    The letter alleged that Mr. Novick disavowed his prior grand jury testimony and his trial testimony was deemed not credible. Neither of these factual assertions are true, no other basis for Mr. Novick's termination was given, and the Defendants have never identified or specified any particular portion of testimony on which they base these allegations.

247.    Throughout the trial in *United States v. Terence Sutton et al.*, 21-CR-598 (PLF), the court never made a finding that Mr. Novick lacked credibility or was impeached, and Mr. Novick did not disavow prior grand jury testimony. The Defendants stated basis for their action against Mr. Novick is false and pretextual.

248.    By adding Mr. Novick's name to the *Lewis* list and terminating his employment, Defendants, and those acting in concert with them, intentionally discriminated against Mr. Novick based on his race.

249.    Mr. Novick further alleges that Defendants are liable under Title VII pursuant to the "cat's paw" theory of liability. *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).

250.    Upon information and belief, one or more of the USAO-DC and/or USMS Officials—such as the prosecutors who believed, wrongly, that Mr. Novick had testified with an intent to support the *Sutton* defendants *for racial reasons*, in that he was white, or that as a white police officer he and his fellow officers harbored racial animosity towards the decedent Hylton-Brown—harbored discriminatory animus against Mr. Novick based on his race.

251.    These biased officials, even if not ultimate decision-makers, provided false, misleading, or incomplete information to the *Lewis* committee with the intent to cause an adverse employment action against Mr. Novick and thus they themselves engaged in a form of race-based decision making, using racial tropes or bias to conclude that Mr. Novick needed to be removed.

252.    The final decision-makers relied on this biased information when they determined to terminate Mr. Novick due to his placement on the *Lewis* list, effectively serving as a conduit for the discriminatory animus of the biased officials. The biased officials' discriminatory actions were a proximate cause of the adverse employment action against Mr. Novick, as they were intended to cause, and did in fact cause the termination of his employment due to his placement on the *Lewis* list. Further the termination of Mr. Novick was in retaliation for protected activity, truthfully testifying about the facts in a racially charged case, which highlighted that race was a factor.

253.    Defendants are liable for the discriminatory animus of these officials, even if the ultimate decisions-makers themselves did not harbor discriminatory intent.

254.    Defendants also failed to conduct an independent investigation that would have revealed the pretextual nature of Mr. Novick's placement on the *Lewis* list, instead rubber-stamping his termination based on the racially motivated actions of those proposing Mr. Novick's listing.

255.    Upon information and belief, non-white law enforcement agents have been accused of lacking credibility or deemed not credible and were either not placed on the *Lewis* list or placed on the *Lewis* list but notified and allowed to challenge the placement and/or continue their federal employment.

256.    Upon information and belief, white officers of the MPD have been judged more harshly for matters involving interaction with minority defendants since the protests surrounding George Floyd erupted. The USAO-DC was responding to political, press-related, and community pressure, which included an attack on the Fourth MPD District itself, and was playing to racial fears when it conducted the prosecution of the officers who pursued Hylton-Brown.

257.    The USAO-DC has provided non-white law enforcement agents notice of their placement on the *Lewis* list and allowed them the opportunity to contest the placement and/or continue their employment. Defendants, and those acting in concert with them, have intentionally treated non-white law enforcement agents differently than white law enforcement agents, including Mr. Novick.

258.    No rational basis for such disparate treatment exists.

259.    The disparate treatment was based on discriminatory grounds because Mr. Novick is white/Caucasian, and thus the Defendants are liable to Mr. Novick under Title VII. As a result of the Defendants' unlawful discrimination, Mr. Novick suffered significant harm, including the loss of past and future wages and benefits, mental and emotional distress, and the costs of bringing

this action. He is entitled to actual damages, pain and suffering, attorney's fees and costs, and injunctive relief, including reinstatement to his position as a Deputy U.S. Marshal at the USMS.

**COUNT FIVE**
**Violation of the Administrative Procedure Act**
**(First Amendment Violation)**

260.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

261.    The Administrative Procedure Act authorizes judicial review of final agency actions and permits courts to "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

262.    Defendants, through their respective agency heads, took final agency action when they placed Mr. Novick on the *Lewis* list based on his truthful testimony in the case *United States v. Terence Sutton et al.*, 21-CR-598 (PLF).

263.    This final agency action violated the First Amendment to the United States Constitution because it constituted retaliation against Mr. Novick for engaging in protected speech when testifying truthfully in an official proceeding.

264.    Defendants' actions were "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B) because they violated Mr. Novick's First Amendment Rights.

265.    Defendants' actions were also "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A) because they punished Mr.

Novick for speech protected by the First Amendment without any legitimate governmental interest that would outweigh Plaintiff's constitutional rights.

266.    Defendants' actions were further "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D) because they failed to follow their own guidance and protocol regarding *Lewis* list determinations, which require consideration of First Amendment protections for testifying witnesses.

267.    As a direct and proximate result of Defendants' violations of the APA, Mr. Novick has suffered and continues to suffer substantial harm, including but not limited to damage to professional reputation, loss of career opportunities, emotional distress, and economic damages. Mr. Novick is entitled to declaratory and injunctive relief, attorney's fees and costs, and such other relief as the Court determines just and proper.

**COUNT SIX**
**Violation of the Administrative Procedure Act**
**(Lack of procedural safeguards)**

268.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

269.    The APA ensures that federal agencies are held accountable to the public by providing a "right to review" to any "person suffering legal wrong because of agency action or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

270.    The APA permits a district court to review final agency action, as well as action for which there is no other adequate remedy. *Id*. §§ 702, 704.

271.    Under the APA, a U.S. district court may hold unlawful agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

272.    Without any notice or opportunity to dispute the designation, Defendants, and their officers, added Mr. Novick's name to the *Lewis* list.

273.    Defendants' and their officers' position is that Mr. Novick's name was added to the *Lewis* list due to his trial testimony in *United States v. Terence Sutton et al.*, 21-CR-598 (PLF), where he testified for the government and defense while still employed with the District of Columbia MPD.

274.    Defendants' and their officers' position is that in his trial testimony, Mr. Novick disavowed his prior sworn grand jury testimony, and his trial testimony was deemed not credible.

275.    At no time during the trial in *United States v. Terence Sutton et al.*, 21-CR-598 (PLF), did the court render a finding that Mr. Novick lacked credibility or was impeached.

276.    Defendants' and their officers' position was that Mr. Novick must be terminated from his employment at the USMS because he lacks credibility and cannot testify in court under *Giglio v. United States*, 405 U.S. 150 (1972).

277.    Defendants and their officers failed to engage in reasoned decision-making by not considering relevant evidence that Mr. Novick could have provided had he been given notice and an opportunity to respond to the allegation that he lacked credibility.

278.    Defendants' and their officers' placement of Mr. Novick's name on the *Lewis* list constituted final agency action and led to his automatic termination.

279.    Defendants' and their officers' scheme to add Mr. Novick's name to the *Lewis* list is a perfect example of arbitrary and capricious agency action amounting to an abuse of discretion.

280.    Defendants' arbitrary and capricious actions have directly harmed Mr. Novick. Beyond leading to his termination, Defendants' actions damaged Mr. Novick's professional

reputation, impaired his ability to testify in court proceedings, limited his career advancement opportunities, and affected his future employment prospects.

281.    Mr. Novick is not required to exhaust administrative remedies because no meaningful administrative remedies were made available to him.

282.    Mr. Novick is entitled to declaratory and injunctive relief, attorney's fees and costs, and such other relief as the Court may award.

## COUNT SEVEN
## Violation of the Administrative Procedure Act
### (Failure to follow internal guidance)

283.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs.

284.    The APA authorizes courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

285.    The APA permits a district court to review final agency action, as well as action for which there is no other adequate remedy. *Id*. §§ 702, 704.

286.    Under the Accardi doctrine, established in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) and consistently applied by the D.C. Circuit, federal agencies are legally bound to follow their own regulations and procedures. The USAO-DC has established guidance and protocols governing *Lewis* list determinations.

287.    This guidance includes but is not limited to: giving notice to law enforcement officers before placing them on the *Lewis* list, opportunities for officers to respond to potential *Lewis* list material before final determinations, a review process to ensure accuracy of information before disclosure, and procedures for officers to challenge or appeal *Lewis* list determinations.

288.    Defendants and their officers placed Mr. Novick on the *Lewis* list without providing the procedural protections provided by the USAO-DC's own guidance, including: failure to provide Mr. Novick with notice before placement on the *Lewis* list, failure to provide Mr. Novick with the specific allegations or information forming the basis for the *Lewis* list determination, failure to afford Mr. Novick any opportunity to respond to the allegations before placement on the *Lewis* list, and failure to provide any mechanism for Mr. Novick to challenge the determination.

289.    Even in the absence of specific written procedures, the APA requires agencies to observe minimal procedural safeguards before taking actions that significantly affect an individual's rights, reputation, and career prospects. The complete absence of procedural safeguards in Mr. Novick's case constitutes action "without observance of procedure required by law" under 5 U.S.C. § 706(2)(D).

290.    Defendants' failure to follow their own procedures and to provide minimal procedural safeguards before placing Mr. Novick on the *Lewis* list has directly harmed Mr. Novick by affecting his continued employment, damaging his professional reputation, impairing his ability to testify in court proceedings, and limiting his career advancement opportunities.

291.    Defendants' actions constitute final agency action for which there is no other adequate remedy in court. The procedural violation itself consists of the failure to provide administrative remedies. Mr. Novick is entitled to declaratory and injunctive relief against Defendants to remedy Defendants' ongoing violations of the APA.

## CONCLUSION

292.    Plaintiff has been subject to a miscarriage of law by the very entity tasked with ensuring fairness and justice, the Department of Justice and two of its components. Denying Mr. Novick the slightest due process, the Department of Justice has relied on the shroud of secrecy surrounding the *Lewis* list.

293.    Plaintiff was fired because he was on the *Lewis* list and nothing more, but why he was on that list, who put him there, who made the decision that he should stay there and why the mere placement on the list should end his employment or not be seen as an act of vengeance, has never been explained.

294.    Law enforcement is tasked with protecting due process of law. They should also be accorded with it. And the same prejudices that the USAO-DC and advocates for racial and political justice seek to eradicate, stereotypes of behavior based on conjecture, should not be applied to law enforcement itself. Mr. Novick demands that he have due process before he can be fired or adjudicated as a liar or dissembler and that such decisions be made clearly, explicitly and in writing, free from discriminatory or retaliatory intent.

## DEMAND FOR JURY TRIAL

Plaintiff Cory Novick hereby requests trial by jury for all claims herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court grant the following relief:

A.      Accept jurisdiction over this matter;

B.      Award Mr. Novick his past and future loss of wages and benefits, plus interest, in an amount to be proven at trial, but not less than $2.5 million;

C.      Award Mr. Novick compensatory and punitive damages for each claim, in an amount to be proven at trial, but not less than $2.5 million;

D.      Award Mr. Novick back pay (including benefits);

E.      Award Mr. Novick front pay (including benefits);

F.      Reinstate Mr. Novick to his former position as a Deputy U.S. Marshal with the USMS;

G.      Declare that Defendants' conduct described herein as applied to Mr. Novick violates the First and Fifth Amendments to the United States Constitution, the Civil Rights Act of 1964, and the Administrative Procedure Act;

H.      Issue an injunction ordering removal of Mr. Novick from the *Lewis* list and prohibiting any further retaliatory conduct;

I.      In the alternative, issue an injunction ordering Defendants to hold a hearing where Mr. Novick can contest his placement on the *Lewis* list and clear his name and prohibit any further retaliatory conduct;

J.      Require the USAO-DC to create constitutionally adequate procedural safeguards for the *Lewis* list;

K.      Award to Mr. Novick all costs and reasonable attorney's fees incurred in connection with this action; and

L.      Grant Mr. Novick such additional or alternative relief as the Court deems just and proper.

Dated: December 2, 2025

Respectfully submitted,
CORY NOVICK
By Counsel,

/s/ *Kevin E. Byrnes*
Kevin E. Byrnes, Esq. (D.C. Bar No. 480195)
Kelly E. DuBois, Esq. (D.C. Bar No. 1013713)
**Fluet**
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T : (703) 590-1234
F : (703) 590-0366
kbyrnes@fluet.law
kdubois@fluet.law
e-file@fluet.law

*Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 2nd, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I also certify that the foregoing document is being served on Defendant's counsel of record and that service will be accomplished by the CM/ECF system.

*/s/ Kevin E. Byrnes*
Kevin Byrnes, Esq.